

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00367-CV

IN THE INTEREST OF I.D.J.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In two issues, Appellant Mother appeals the termination of her parental rights to I.D.J.  We affirm.

### II. Background

The trial court ordered the termination of Mother's rights to I.D.J. after it found that Mother had knowingly placed or knowingly allowed the child to remain

---

[1]*See* Tex. R. App. P. 47.4.

in conditions or surroundings that endangered the child's physical or emotional well-being; had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being; and had had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of section 161.001(1)(D) or (E); and that it was in the child's best interest to terminate her parental rights to the child.[2] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M), (2) (West Supp. 2011).

The trial court filed findings of fact and conclusions of law at Mother's request in which, in addition to reiterating the termination grounds above, it found the following, summarized below:

- Mother had used cocaine, marijuana, and alcohol while pregnant with I.D.J.;

- Mother, when living in Indiana, had abused alcohol, cocaine, and marijuana while parenting her other children, who were subsequently placed into foster care in Indiana due to her conduct;

- Mother abandoned these other children to the State of Indiana and continued to abuse alcohol, cocaine, and marijuana rather than engaging in drug treatment so that she could be reunified with these children;

- While living in Indiana, Mother began a relationship that involved domestic violence and drug use and became pregnant with I.D.J.;

- Mother's parental rights to the three older children were terminated in Indiana based on her endangering conduct of illegal drug use;

---

[2]Because Mother challenges the legal and factual sufficiency of the evidence to support the termination of her parental rights, we will discuss the facts in our analysis.

- While Mother reportedly moved to Texas to avoid further violence from D.J.,[3] she continued her violent relationship with him while denying the relationship to Child Protective Services (CPS) and exposed I.D.J. to violence from D.J. by continuing to allow him in the same home with her and I.D.J.; she exposed I.D.J. to at least three domestic violence instances to which police responded;

- During the pendency of the case and after I.D.J. had been placed in foster care, Mother continued to be dishonest about her relationship with D.J., continued to abuse alcohol while pregnant with another child, and refused to submit to court-ordered hair-strand drug tests; and

- Mother failed to show an ability to provide I.D.J. with a safe home environment.

This appeal followed.

### III. Termination of Parental Rights

In her first issue, Mother does not challenge any of the trial court's specific findings of fact. Instead, she challenges the specific termination grounds under section 161.001(1), arguing that the evidence is legally and factually insufficient to terminate her parental rights because (1) there was no clear and convincing evidence that she failed to care for, neglected, or harmed the child; (2) the termination was based on the actions of the child's presumed father; and (3) termination was not in the child's best interest. She also contends that "[n]otwithstanding the entering of the non-certified copy of the order, the trial court was not required to terminate [her] parental rights under subsection (M)."

---

[3]During trial, Mother testified that D.J. was I.D.J.'s father and possibly also the father of her unborn child. The trial court terminated D.J.'s parental rights to I.D.J., but D.J. does not appeal.

## A. Standard of Review

We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985); *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id*. § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*,

243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the

5

parent violated subsections (D), (E), or (M) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Endangerment

### 1. Applicable Law

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125.

6

To determine whether termination is necessary because of endangerment, courts may look to parental conduct both before and after the child's birth. *J.T.G.*, 121 S.W.3d at 125 (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.— Fort Worth 2001, no pet.)). A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *Id.* (citing *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.)). The specific danger to the child's well-being may be inferred from parental misconduct alone. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder was not required to ignore a long history of dependency and destructive behavior, including abusing drugs and alcohol, in considering endangerment); *see also D.T.*, 34 S.W.3d at 636–37 (stating that evidence of conduct before child is born, as well as evidence as to how a parent has treated another child, is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established).

## 2. Evidence

### a. Drug Use and Domestic Violence

Mother, CPS caseworker Elizabeth Cuevas, Family Based Social Services (FBSS) caseworker Sukyoung Jan, CPS supervisor Jennifer Thompson, CPS investigator Jamie Villanueva, court-appointed special advocate (CASA) worker Patricia Morris-Harried, Fort Worth Police Officer Donald Carman, and Enrique Arjona, the manager of the apartment complex where Mother lived, testified at

trial. The trial court also admitted in evidence Mother's counseling records, the criminal convictions for two misdemeanor assaults committed by D.J., I.D.J.'s alleged father, and the renewal signed by Mother and D.J. to extend their apartment lease to July 31, 2012.

I.D.J. was born in Texas on June 22, 2010. Villanueva, the CPS investigator, received a referral on June 23, 2010 containing allegations that Mother had tested positive for marijuana in March and April 2010 while she was pregnant with I.D.J. Villanueva contacted Mother at Mother's sister L.W.'s house, and Mother denied the allegations at first but then confirmed that she had smoked marijuana during her pregnancy with I.D.J. and said that the last time she had done so was April 2010.

Mother also initially told Villanueva that her three older children in Indiana were living with their father and paternal grandmother because Mother had been arrested and that she planned to find a bigger place to live and to reunite with them. However, Mother then revealed to Villanueva that the children were actually in foster care in Indiana and that her parental rights to them had been terminated because of her drug use and her failure to appear at the final court hearing.[4] Mother told Villanueva that she had been to drug rehab and that she

---

[4]Mother also told Jan, her FBSS caseworker, that she had used drugs during her pregnancy with I.D.J. and that her parental rights to her other children had been terminated due to her drug use.

had used drugs afterwards.[5]  After Villanueva's investigation, Mother signed a safety plan, agreed to supervised contact with I.D.J., and planned to live with L.W. and L.W.'s fiance.

Mother, who was thirty years old at the time of the trial, said that she had been addicted to drugs since she was twenty-two or twenty-three, when her first baby's father left her.  She admitted that she had been addicted to cocaine, that she had gone through rehab, and that she will always be an addict in recovery.  She also admitted that her parental rights to her three older children had been terminated by the State of Indiana on November 18, 2009, while she was pregnant with I.D.J., stating, "I screwed up with my first three kids."  Mother said that she tested positive for marijuana when she went to the hospital to obtain proof of her pregnancy with I.D.J. for Medicaid, but she said that she did not recall telling the CPS investigator that until April 2010, she had been smoking marijuana while pregnant with I.D.J.  Mother also said that I.D.J. did not test positive for drugs at birth.

Mother and D.J. signed an apartment lease on July 29, 2010.  Mother's FBSS counseling began in August 2010, and her counseling records reflect that the father of her three older children had been very abusive.  In her handwritten

---

[5]Mother's counseling records indicate that her parental rights had been terminated in November 2009 to her three older children because in May 2009, she had left an inpatient drug treatment program after fifteen months, against medical advice, and then resumed daily cocaine use, tested positive for cocaine, and missed three court appointments.  According to these records, Mother said that her last use of cocaine had been around August 2009.

9

domestic violence homework, Mother admitted, "I know I have made a lot of bad choices w[ith] men throughout my life." In the domestic violence danger assessment questionnaire, Mother answered "yes" to nine out of fifteen questions, including the following:

- Has the physical violence increased in frequency over the past year?

- Has the physical violence increased in severity over the past year and/or has a weapon or threat from a weapon ever been used?

- Does he ever try to choke you?

- Does he use drugs? By drugs I mean "uppers" or amphetamines, speed, angel dust, cocaine, "crack," street drugs or mixtures?

- Have you ever been beaten by him while you were pregnant?

Mother marked that she strongly agreed with the following statements in the "Women's Experience with Battering Scale":

- He makes me feel unsafe even in my own home.

- I try not to rock the boat because I am afraid of what he might do.

- I feel like he keeps me prisoner.

- He makes me feel like I have no control over my life, no power, no protection.

- I hide the truth from others because I am afraid not to.

- I feel owned and controlled by him.

- He can scare me without laying a hand on me.

- He has a look that goes straight through me and terrifies me.

Mother did not indicate that she was referring to D.J. in her questionnaire responses, but her December 20, 2010 counseling notes indicate that when D.J. "began becoming violent (choking, etc[.]) she had already been thru [sic] it with the other children's father and knew the warning signs and was not going to go thru [sic] it again." The December 20, 2010 notes also reflect that Mother spoke with D.J. around once a week, and the January 3, 2011 notes indicate that Mother had spent the weekend with D.J., who "was once an abusive partner to her."

Mother said that she had met D.J. at a drug treatment center and that he followed her to Texas when I.D.J. was born. D.J. went back and forth between Texas and Indiana, and he was in and out of jail when he was in Texas. Mother's sister L.W. complained to the police that she had been assaulted by D.J., and Mother called the police when D.J. threw her and I.D.J. out of the house. D.J.'s November 22, 2010 convictions were for a July 2010 misdemeanor assault against Mother and an August 2010 misdemeanor assault against L.W.

Jan said that Mother told her in August 2010 that D.J. was a very abusive man and that the abuse was why they had ended their relationship. Mother denied that she had ever told Jan that D.J. was violent, but she admitted that she had told Jan that they "g[ot] into it in Indiana before [she] moved to Texas," and that the Indiana altercation occurred because D.J. found out that she was using drugs while pregnant.

11

Jan said that as of August 2010, Mother agreed that D.J. was not a good person to be around I.D.J. and that it was better for I.D.J. to remain with Mother's sister L.W. However, when D.J. called Jan in September 2010, he told her that he had been living with Mother. Arjona, the manager of the apartment complex where Mother lived, testified that D.J. stayed with Mother from time to time, saying, "[H]e's there, he's not there, and, you know, it all depends on the time of year, I guess." Arjona said that D.J. sometimes paid the rent.

Jan said that when D.J. called her in September 2010, he told her that L.W. had moved in and that she and Mother had started drinking and partying every night. D.J. told Jan that he did not feel that I.D.J. was safe with Mother and L.W., and he asked for I.D.J. to be placed into foster care. When Jan met with Mother the next day, Mother told her that D.J. was out of state and denied any alcohol or drug use.[6] After Jan investigated, CPS decided to place I.D.J. into foster care. On September 20, 2010, the Department of Family and Protective Services (DFPS) filed its petition in this case.

Thompson, the CPS Supervisor, testified that CPS received a referral regarding a June 24, 2011 domestic violence incident involving Mother. Mother told Thompson and Cuevas that the incident had involved her sister. However, during her testimony, Mother admitted that in June 2011, she had called the

---

[6]Thompson, Cuevas, and Villanueva each testified about their concerns that Mother had been dishonest during the case, particularly with regard to her relationship with D.J.

police for a domestic violence incident. She denied recalling that she had told the police that she had been assaulted by her husband[7] and stated that she had only told the police that she did not want D.J. back in her house. Mother testified,

> I might have exaggerated on a lot of stuff. He did push me, yes, he did, but I didn't want him—I told him that I wasn't playing, you know, and that I wasn't going to take it, and that's when I called the police so he wouldn't come back to my house.

Fort Worth Police Officer Donald Carman testified that on the evening of June 24, 2011, he responded to a domestic disturbance call about an assault at the apartment complex where Mother lived. He identified Mother as the person he had spoken with at the complex and said that Mother had been extremely intoxicated—she had a strong odor of alcohol on her breath and person, had trouble standing, and had slurred speech—and that getting information from her was very difficult because she kept changing her story and would not give him any identifying information about the assailant other than his name and date of birth. Officer Carman said that Mother appeared pregnant at the time, that she told him that she was pregnant, and that she told him that her assailant was her husband, who lived there with her. Mother denied that she had been drinking alcohol that day.

During cross-examination, when asked about her relationship with D.J., Mother said that they had had violent spells, but "[n]ot violent as in bruising,

---

[7]Mother testified that D.J. was not her husband and that she had never been married.

beating, or nothing like that. We've pushed each other, we've shoved each other, we've cussed each other out." When asked about her statement to her counselor that the violence increased to the point that D.J. choked her and she knew she needed to end the relationship, Mother said, "That was in Indiana." Mother explained that D.J. had been violent with her because she was pregnant and using drugs and he did not want her using drugs.

Morris-Harried, Mother's CASA worker, testified that she told Mother on at least two occasions about Safe Haven—a women's shelter—because of her concern that there had been domestic violence in the home that could hurt Mother, I.D.J., or both. Mother replied that she did not need help. Morris-Harried said that she thought Mother's choices were based on what Mother wanted rather than what was best for I.D.J.

### b. Service Plan

CPS gave Mother a service plan that required her to complete the following services: attend Narcotics Anonymous/Alcoholics Anonymous meetings, provide CPS with monthly sign-in sheets, and locate a sponsor; attend domestic violence prevention classes; obtain employment and an appropriate living environment; submit to random drug testing;[8] attend individual counseling;

---

[8]The CPS service plan contained a warning that if Mother did not take an oral swab drug test immediately or a urinalysis or hair strand test within the specified time of notification from her CPS caseworker, the test would be viewed as having a positive result.

attend drug education classes; attend parenting classes; and participate in a psychological evaluation.

With regard to the drug-testing requirement, after a CPS investigator told Mother that her June 2011 oral swab drug test showed positive for a drug or drugs, Mother agreed to take another drug test.[9] Mother said that she became aggravated and refused to take the drug test when she learned that it was going to be a hair strand drug test because she had been under the impression that the drug test would be a urine test.[10] When asked in court if she was willing to take a drug test, Mother refused, explaining that she did not see the need for it and saying, "I know I'm clean, and ain't nobody been worried about coming out and testing me."

Mother stated that she had completed her parenting classes, the initial drug assessment, her counseling,[11] and her domestic violence classes, that she had a job at a fast food restaurant that paid $7.25 per hour, and that she had a

_____

[9]Thompson testified that CPS learned that Mother was pregnant again on the same day that Mother's oral swab drug test was "dirty" for methamphetamines, amphetamines, marijuana, and cocaine.

[10]Cuevas said that an oral swab drug test determines drug usage up to seventy-two hours before the test; in comparison, a hair strand drug test will determine approximately three to four months of drug use prior to the test, as well as how much the client has used during that time period. When asked why she did not want to take a hair strand drug test, Mother said that those went farther back and that CPS was "using enough of [her] past against [her]."

[11]The January 10, 2011 counseling notes indicate that Mother had met her counseling goals, although she was still working on improving her decision-making skills, and that she had been successfully discharged.

one-bedroom apartment. Mother said that she was up for a manager position after her baby was born,[12] that her baby was due September 25, 2011, and that if the court returned I.D.J. to her, her mother would watch I.D.J. while Mother was at work. FBSS caseworker Jan testified that when asked about potential family members for placement, Mother did not list anyone[13] and that Mother had told her that her mother would not be an appropriate caregiver.[14]

Thompson, the CPS supervisor, testified that Mother completed her counseling services but that the counselor's notes raised some concerns, specifically with regard to Mother's continued relationship with D.J. and CPS's concerns about domestic violence. After Mother completed her counseling, Thompson asked Mother to continue in counseling with another agency, to go to classes at Safe Haven, and to continue to address the domestic violence issues. Thompson said that Mother had completed her counseling with one company but that she did not accept this as "being completed" based on the counseling notes

---

[12]Mother was pregnant with her fifth child at the time of the termination trial at issue here.

[13]Mother's counseling records indicate that she no longer speaks to one of her sisters, who took her three older children to CPS while Mother was in jail.

[14]Mother's counseling records reflect that CPS removed Mother from her own mother when she was thirteen for neglect and conditions of the home. Mother stated that she would rather have I.D.J. in foster care than with a relative because they had "all grew up in the same thing," and because she did not trust anyone with her children, stating, "I know if it's like the State, I know that they're not going to do my baby wrong."

16

that she received because she did not feel that Mother had demonstrated a change.

Mother completed her classes at Safe Haven but only attended one session of additional counseling. Contrary to Mother's testimony, Thompson said that Mother did not follow through with her parenting classes.[15]

With regard to the two additional services, Mother said that she told CPS that "we can skip the drug assessment. I'll take drug classes, because, to be honest, that's what I was in this case for, and that's like the one thing they overlooked. They were so worried about always something else."

Cuevas said that when she took over as Mother's CPS caseworker in June 2011, Mother still needed to complete her drug and alcohol assessment, the additional individual counseling, parenting classes, and her psychological evaluation. By trial in early September 2011, Mother had attended only one additional counseling session and had not completed the drug assessment or psychological evaluation; the CPS file did not show that Mother had completed her parenting classes.

---

[15]Mother offered a document purporting to be a certificate of completion of parenting classes from the provider CPS used, but Thompson said that she did not have that document in the CPS file or in what CPS had subpoenaed from the parenting class provider. She also said that the signature purporting to be from the provider's employee did not look like that employee's signature. The trial court sustained DFPS's objection to the validity of the document but allowed it to be admitted for record purposes.

Mother missed some of her visits with I.D.J., attributing her absences "to court and lack of communication between [her] and the caseworkers on what time the court was or something like that, and they would end up being on the same day as my visits." Nonetheless, Mother said that she and I.D.J. had had good visits and that she felt like the bond between them was very strong. Jan, the FBSS caseworker, agreed that Mother was appropriate with I.D.J. when Jan was there and that there was a bond between Mother and I.D.J. Morris-Harried, Mother's CASA worker, said that Mother and I.D.J. did not appear bonded and that I.D.J.'s personality with her foster mother was completely different than when she was with Mother in that I.D.J. was "not as happy, smiling, and freely loving" as she was with the foster mother.[16]

Cuevas said that at the last visit between Mother and I.D.J., she became concerned that Mother might have used drugs based on the way Mother was talking, gritting her teeth, and moving her mouth. Cuevas also said that I.D.J. had been in the same foster home for the entire case, was healthy and flourishing, and had met all of her developmental milestones. CPS was waiting until the conclusion of the case to look for a dual-licensed or adoption home for I.D.J. Cuevas recommended terminating Mother's parental rights to I.D.J.

---

[16]Morris-Harried observed Mother with I.D.J. once and met with Mother once in her home, twice at Mother's workplace, and once at the CPS office. She observed I.D.J. in the foster home several times.

When asked what she would do if I.D.J. were returned to her that day, Mother said that she did not know what her plans would be to take care of the child but then added, "I will do whatever I have to do for my child." When asked what she would do if the trial court required her to keep I.D.J. away from D.J., Mother said she would call the police, change her phone number, and move without giving him a forwarding address "if that's what it takes."

During her own case, Mother again testified that she had completed her parenting classes in January 2011. She did not complete the psychological evaluation "because they scheduled it like a month ahead and [she] forgot" and then never rescheduled it. Mother denied that she had used methamphetamines or amphetamines in May 2011, but she admitted that she had been around marijuana because she had asked someone for a ride somewhere, "and when [she] got in the car . . . they were smoking." Mother said that she believed this exposure is what caused her to fail her drug test as to marijuana. Mother asked the court for additional time to complete her services but admitted that even if given more time, she would not take a hair strand drug test.

### 3. Analysis

From the testimony and other evidence in the record as set out above, the trial court could have reasonably formed a firm belief or conviction that, following the same pattern of behavior with regard to the termination of her parental rights to her three older children, Mother had endangered I.D.J. by using drugs during her pregnancy with I.D.J. and by exposing I.D.J. to domestic violence prior to

I.D.J.'s removal from her, as well as endangering her unborn child by drinking alcohol while pregnant and exposing the unborn child to domestic violence by renewing the lease for the apartment that she shared with D.J. Therefore, under the applicable standards of review, we conclude that the evidence is both legally and factually sufficient to support the trial court's finding under section 161.001(1)(E). *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *cf. In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *4–5, 8, 11–12, 14 (Tex. App.—Fort Worth Dec. 22, 2011, pet. filed) (mem. op.) (holding evidence legally and factually insufficient to support endangerment findings when Mother stopped using drugs when she discovered that she was pregnant and then remained "clean" during the CPS case and removed herself from the domestic violence situation creating danger to herself and the child). And because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination, we overrule this portion of Mother's first issue without reaching her contentions under subsections (D) and (M). *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

## C. Best Interest

In the remaining portion of her first issue, Mother complains that termination of her parental rights was not in I.D.J.'s best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and

20

permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services, to cooperate with and facilitate an appropriate agency's close supervision, and to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing for the child and other children under the family's care; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

The record reflects, among other things, a history of abusive conduct by persons with access to the child's proposed home with Mother, a history of substance abuse by Mother, a conflict between Mother's version of events and CPS's with regard to the completion of Mother's parenting classes, a lack of an adequate social support system to assist Mother with I.D.J., and Mother's lack of a plan to care for I.D.J. Comparing the record against the factors set out above, we conclude that the evidence is both legally and factually sufficient to support

22

the trial court's best interest finding, and we overrule the remainder of Mother's first issue.

## D. Due Process

In her second issue, Mother complains that her federal and state due process rights were violated by the trial court's termination order because she "never expressly intended to abandon the children before, during, or after he [sic] was temporarily incarcerated" and because the testimony at trial showed that she was a fit mother. Mother appears to be challenging the trial court's finding under section 161.001(1)(M).[17] However, because we have already found the evidence legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), we need not address this argument, and we overrule Mother's second issue. *See E.M.N.*, 221 S.W.3d at 821.

## IV. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED: June 14, 2012

---

[17]The trial court did not find or conclude that Mother had abandoned I.D.J. and did not terminate Mother's parental rights on that ground, and the record does not reflect that Mother was incarcerated—temporarily or otherwise—during the pendency of this case. The trial court found in its fact findings that Mother had abandoned her three older children to the State of Indiana.